# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 21, 2010

## STATE OF TENNESSEE v. GEORGE D. OAKES

### Appeal from the Criminal Court for Knox County
#### No. 89812      Richard R. Baumgartner, Judge

### No. E2010-00636-CCA-R3-CD - Filed April 26, 2011

The Defendant, George D. Oakes, was charged with one count of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210. Following a jury trial, the Defendant was convicted of the lesser included offense of voluntary manslaughter, a Class C felony. See Tenn. Code Ann. § 39-13-211. The trial court sentenced the Defendant as a Range III, persistent offender to 15 years. In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain his conviction for voluntary manslaughter and (2) the trial court abused its discretion in sentencing the Defendant. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

R. Alexander Brown, Knoxville, Tennessee, for the appellant, George D. Oakes.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; Ta Kisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On March 28, 2008, the Defendant was staying at a homeless camp located under a viaduct on Magnolia Avenue in Knoxville, Tennessee. Mark Scalf, who was at the camp as well, testified at trial that he and several other people, including the Defendant and the victim, Lewis Brewer, spent the day "[h]anging out" and drinking vodka. Mr. Scalf testified that he had heard other people at the homeless camp talking about a fight earlier that day but

that he did not witness the fight. After the victim finished drinking, he laid down on a concrete ledge approximately ten feet above the ground. According to Mr. Scalf, the victim had slept on the concrete ledge before and had never fallen off. After the victim had fallen asleep, the Defendant "came down the hill, . . . [and] just pushed [the victim] off that ledge." The Defendant then ran away. Mr. Scalf testified that he was sitting about ten feet away when he saw the Defendant push the victim over the ledge. Mr. Scalf went to check on the victim and found him lying face down on the ground and bleeding from his nose and mouth. When questioned by police, Mr. Scalf picked the Defendant's picture out of a photographic line-up.

Mr. Scalf admitted that he had been an alcoholic for over 30 years. However, he testified that alcohol made him "get happy" but that he remained able to tell what was going on around him. Mr. Scalf admitted that he was intoxicated when the Defendant pushed the victim, but he testified that he was not "so intoxicated that [he] couldn't tell what was going on." Mr. Scalf also testified that he had never had a problem remembering events after being intoxicated. On cross-examination, Mr. Scalf admitted that he had "an argument" with the Defendant prior to March 28, 2008. Mr. Scalf also admitted that another witness, Donnie Bittle, "had some disagreements" with the Defendant and that he now worked for Mr. Bittle. Mr. Scalf further testified on cross-examination that it was not uncommon for people to fall off the concrete ledge. In fact, Mr. Scalf himself had fallen off the ledge a few weeks prior to March 29, 2008, and broken his back.

Mr. Bittle testified that he owned a business located about 200 yards from the viaduct. On March 28, 2008, Mr. Bittle saw the Defendant running through an ally near his business. Mr. Bittle testified that this was strange because the Defendant "usually just mop[ed] around." Shortly after seeing the Defendant, Mr. Bittle "heard sirens coming" and walked to the viaduct to see what was going on. Mr. Bittle testified that several people told him "that somebody had [been] shoved off the wall." Mr. Bittle admitted that he had known the Defendant ever since he began renting an apartment to the Defendant's mother. Mr. Bittle testified that the Defendant lived in the apartment with his mother but that he evicted the Defendant after he "jump[ed] on the other people that lived there" and "kicked a woman in the face." Mr. Bittle admitted that he called the police when the Defendant sneaked back onto his property because the Defendant was "a dangerous person."

Officer J.D. Hopkins of the Knoxville Police Department (KPD) testified that he responded to the scene on March 28, 2008. Officer Hopkins interviewed Mr. Scalf and another witness named Blevins. Officer Hopkins testified that he could tell the witnesses had been drinking but that he did not arrest them for public intoxication because he did not feel they were so intoxicated that they were a danger to themselves or others. Officer Hopkins also spoke with the victim, who indicated that he had been drinking and "that he was shoved

from the landing." Gerald Smith with the KPD crime scene detail testified that the victim landed approximately three feet from the ledge. Officer Todd Childress of the KPD testified that he assisted in the investigation of this case and the search for the Defendant. Officer Childress testified that the Defendant was located on April 4, 2008, and was intoxicated but calm. However, Officer Childress testified that when the Defendant saw the lead investigator in the case, he became belligerent for no apparent reason. Investigator Ryan Flores of the KPD testified that when he attempted to interview the Defendant, he was belligerent and uncooperative. However, Investigator Flores testified that the Defendant said, "I was fighting that old boy, but I didn't kill nobody."

Dr. Darinka Mileusnic-Polchan, the medical examiner, testified that she performed an autopsy on the victim and determined his cause of death to be a homicide. Dr. Mileusnic-Polchan testified that the victim was hospitalized for five days before he died; therefore, some of his injuries had started to heal. The autopsy showed that the victim suffered mainly external injuries to his head and neck with a "relatively minor internal component." There was significant bruising around the victim's left ear and on the left side of his face along with swelling and bruising around his left eye. There were also several lacerations on the victim's face. Dr. Mileusnic-Polchan testified that the victim suffered much more significant injuries to his torso with "the main clustering of injury" on the left side. This indicated that "the main impact of the body was in [the] particular area" of the lower left abdomen, hip, and thigh. There was significant bruising that was "very prominent" even after five days of hospitalization. Internally, the victim suffered from nine fractured ribs and a pierced lung. The victim also suffered from a torn spleen which had to be removed during his hospitalization. The autopsy also reflected that the victim suffered from injury to the "inner part of the right lower extremity." However, there was no evidence of fractures to the victim's extremities.

Dr. Mileusnic-Polchan concluded that the victim's injuries were consistent with his falling approximately ten feet and landing on uneven ground. Dr. Mileusnic-Polchan also concluded that the victim's injuries were consistent with him lying on his right side and being pushed. Dr. Mileusnic-Polchan testified that had the victim fallen from a standing position, the majority of his injuries would have been to either his head and neck or to his extremities. Additionally, the lack of injuries to the extremities suggest that there was no defensive movements "to stop or prevent any of the falling." Dr. Mileusnic-Polchan also testified that the closer the victim was to the ledge, the more likely it was that he was pushed. Dr. Mileusnic-Polchan concluded that the victim was pushed while sleeping on his right side and that when he fell, his body rotated and ultimately landed on his left torso. However, Dr. Mileusnic-Polchan conceded that the victim's injuries were also consistent with his having rolled off the ledge. Dr. Mileusnic-Polchan also testified that when the victim was first taken to the hospital, his blood-alcohol level was .26, three times the legal limit. Additionally, Dr.

Mileusnic-Polchan testified that the victim suffered from cirrhosis of the liver and that this was a contributing factor to his death. However, Dr. Mileusnic-Polchan concluded that the victim ultimately "died of multiple blunt force injuries" from being pushed off the ledge.

Based upon the foregoing evidence, the jury convicted the Defendant of the lesser included offense of voluntary manslaughter. The trial court sentenced the Defendant as a Range III, persistent offender based upon the Defendant's seven felony convictions as an adult and two juvenile convictions that would constitute felonies if committed by an adult. The Defendant's prior criminal history included convictions for second degree burglary, burglary of an automobile, assault with a deadly weapon, firing into an occupied dwelling, two convictions for prison escape, and two convictions for aggravated assault. The Defendant also had 14 misdemeanor convictions, including several weapons and assault offenses. In determining the length of the Defendant's sentence, the trial court gave great weight to the Defendant's lengthy criminal history and the fact that the Defendant had multiple parole and probation violations as well as having "racked up numerous violations" while incarcerated. Based on the foregoing, the trial court sentenced the Defendant to 15 years.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for voluntary manslaughter. The Defendant argues that "the State failed to prove beyond a reasonable doubt the alleged incident happened because there was no reliable witness." The Defendant contends that because Mr. Scalf "was admittedly drinking at the time," his testimony should be discredited. The State responds that the evidence was sufficient to sustain the Defendant's conviction. The State asserts that the jury accredited Mr. Scalf's testimony and that in addition to Mr. Scalf's testimony there was circumstantial evidence of the Defendant's guilt.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See

State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person acts knowingly "when the person is aware that [their] conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Mr. Scalf testified that he saw the Defendant push the victim over the ledge. Mr. Scalf admitted that he had been drinking that day but testified that his intoxication did not affect his memory or his ability to understand what was going on around him. In addition to Mr. Scalf's testimony, the victim told Officer Hopkins that he had been shoved off the ledge. Mr. Bittle testified that he saw the Defendant fleeing the scene shortly before the police arrived. The Defendant told Investigator Flores that he fought with the victim prior to the victim's death. The medical examiner determined that the victim's injuries were consistent with having been pushed off the ledge while sleeping. There was sufficient evidence to show that the Defendant pushed the victim off the ledge and that the Defendant was aware that his conduct was reasonably certain to cause the victim's death. The jury also determined that the Defendant's prior fight with the victim was "adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Moreover, any questions regarding Mr. Scalf's credibility were resolved by the jury. Accordingly, we concluded that the evidence was sufficient to sustain the Defendant's conviction for voluntary manslaughter.

*II. Sentencing*

The Defendant contends, in the one sentence of his brief dedicated to this issue, that the trial court "demonstrated a prejudice against [the Defendant] when [the trial court] stated that [it] was unhappy with the verdict of the jury and was making up for the decision by sentencing [the Defendant] to the maximum allowable sentence of 15 years." The State responds that the trial court did not indicate that it was "unhappy" with the jury's verdict. The State further responds that the trial court properly considered all the required

circumstances and sentencing guidelines before sentencing the Defendant and that the Defendant's sentence is not excessive given his extensive criminal history and failure to comply with the conditions of community release.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 335 (Tenn. 2008).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to

reflect the relative seriousness of each criminal offense in the
felony classifications; and

(2) The sentence length within the range should be adjusted, as
appropriate, by the presence or absence of mitigating and
enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); Carter, 254 S.W.3d at 342-43. Therefore, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. As explained by our supreme court in Carter, the 2005 amendments to the Sentencing Act now afford the trial court such greater discretion that:

the trial court is free to select any sentence within the applicable range so long
as the length of the sentence is 'consistent with the purposes and principles of
the [Sentencing Act].

Id. at 343 (citing Tenn. Code Ann. § 40-35-210(d)). Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

While the trial court approved the jury's verdict at the motion for new trial hearing, at the sentencing hearing the trial court stated,

But the proof was [the Defendant] just walked up to [the victim] and just pushed him off. Why this jury came back with a voluntary manslaughter is . . . I don't know. There didn't seem to be any provocation to me. It seemed to me to be the definition of a knowing killing, based on the proof that was presented at trial. But the jury's verdict is the jury's verdict, and they came back with voluntary manslaughter.

In sentencing the Defendant, the trial court relied on the following enhancement factors: (1) the Defendant had a previous history of criminal convictions, in addition to those necessary to establish the appropriate range; (8) the Defendant had previously failed to comply with the conditions of a sentence involving release into the community; (13) the Defendant was on probation at the time of the offense; and (16) the Defendant was convicted of delinquent acts as a juvenile that would constitute a felony if committed by an adult. Tenn. Code Ann. § 40-35-114. Nothing in the record suggests that the trial court's sentencing decision was improperly based on its comment that "[t]here didn't seem to be any provocation to me." Instead, the trial court accepted that "the jury's verdict is the jury's verdict" and sentenced the Defendant to the maximum sentence of 15 years based upon the Defendant's extensive criminal history, which included several assault and weapons related offenses. Additionally, the trial court found that three other enhancement factors applied to the Defendant. Accordingly, we conclude that the trial court did not err in sentencing the Defendant to 15 years.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE